UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TED K.,[1] | )<br>) No. 19 CV 2824 |
| Plaintiff, | )<br>) |
| v. | ) Magistrate Judge Young B. Kim<br>) |
| ANDREW M. SAUL, Commissioner of<br>the Social Security Administration, | )<br>)<br>) December 15, 2020 |
| Defendant. | ) |

**MEMORANDUM OPINION and ORDER**

Ted K. ("Ted") seeks disability insurance benefits ("DIB") and supplemental security income ("SSI"), claiming that he suffers from an arm injury, back problems, nerve damage, bilateral hip disease, heart disease, and diabetes, which prevent him from engaging in full-time work. Before the court are the parties' cross motions for summary judgment. For the following reasons, Ted's motion is denied, and the government's is granted:

**Procedural History**

Ted filed his DIB application in July 2015 and his SSI application in September 2015, alleging disability beginning on January 1, 2012. (Administrative Record ("A.R.") 185-96.) The government denied his applications initially and on request for reconsideration. (Id. at 17, 135-39, 149-54.) Ted requested and received a hearing before an administrative law judge ("ALJ"), (id. at 155-71), and in

---

[1] Pursuant to Internal Operating Procedure 22, the court uses only the first name and last initial of Plaintiff in this opinion to protect his privacy to the extent possible.

November 2017, Ted appeared at the hearing along with his wife, his attorney, and a vocational expert ("VE"), (id. at 37-78). In April 2018 the ALJ issued a decision finding that Ted is not disabled. (Id. at 17-31.) When the Appeals Council declined review, (id. at 1-5), the ALJ's decision became the final decision of the Commissioner, *see Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). Ted then filed this lawsuit seeking judicial review, and the parties consented to the court's jurisdiction. *See* 28 U.S.C. § 636(c); (R. 10).

## Facts

Ted completed high school and one year of college and worked as a truck driver from 2000 to 2013. (A.R. 44, 218.) He says he is unable to work because of weakness in his left arm, pain in his back and hips, and difficulty walking and bending, among other reasons. (Id. at 227-33.)

### A. Medical Evidence

Ted's medical records show that around the time of his alleged disability onset date, his primary impairments were degenerative joint disease, superior labral tear from anterior to posterior ("SLAP") lesion and tendinosis of the left shoulder, musculocutaneous neuropathy in the left upper extremity, left carpal tunnel syndrome, lumbar spondylosis, coronary artery disease, degenerative joint disease in the bilateral hips, diabetes, and obesity. (A.R. 20.) As to his left-upper extremity impairment, Ted reported that he was injured at work in November 2012 and tore ligaments in his left arm. (Id. at 24.) However, on examination in February 2013 Ted had full range of motion in all extremities and no joint swelling

2

or tenderness. (Id. at 1541.) His left shoulder was noted to be "deformed with tenderness," both at the acromioclavicular joint and on the T9 spinal process. (Id.) Testing showed 5/5 motor strength throughout and intact sensation. (Id.)

Ted underwent an arthroscopic labral repair and biceps tenodesis in April 2013. (Id. at 709.) Following the procedure, Ted reported numbness in the forearm extending into his thumb, as well as weakness. (Id.) An electromyography ("EMG") showed an injury to Ted's musculocutaneous nerve, along with evidence of reinjury. (Id. at 708; see also id. at 1584-85.) Ted's treating orthopedist, Dr. Guido Marra, recommended "observation with therapy" and referred Ted to Dr. Gregory Dumanian for an evaluation of a musculocutaneous nerve injury. (Id. at 707-08.) Dr. Dumanian examined Ted in September 2013 and found that with "light touch, he [was] numb in the lateral antebrachial nerve distribution" and that his ulnar, median, and radial nerves were intact. (Id.) Dr. Dumanian reported that Ted was not "a great nerve transfer candidate" in light of his improvement. (Id.)

In August 2013 Ted reported increased pain with left arm movements, but he was able to flex his elbow and "participate in prone rows, horizontal abduction, and extension with difficulty and pain." (Id. at 602.) An x-ray showed that Ted did not have an "obvious bony impingement" in his shoulder. (Id.) For treatment of his left upper extremity impairment, Ted participated in physical therapy from January 2013 to January 2014. (Id. at 296-700.) He was prescribed Gabapentin, Hydrocodone, and Methadone for pain and neuropathy. (Id. at 829.)

3

In January 2014 Ted continued to experience symptoms in his arm and hands, but he had 5/5 strength and was able to perform all movements. (Id. at 544.) A May 2014 MRI arthrogram did not show any "significant structural abnormalities." (Id. at 704.) In July 2014 Ted had another EMG that showed bilateral carpal tunnel syndrome, as well as lateral antebrachial cutaneous and musculocutaneous chronic compression, and suboptimal signal output. (Id. at 703.) Ted reported decreased arm pain at a level of 5/10 in August 2014. (Id. at 1679.) In terms of his hip pain, a November 2014 right hip x-ray did not identify any acute displaced fractures. (Id. at 1727-28.) That same month, Dr. Marra advised that Ted could return to work with certain restrictions, including that he could push 77 pounds static, pull 120 pounds static, and lift 7 pounds overhead. (Id. at 713.)

In January 2015 Ted reported left shoulder pain at a level of 4 or 5/10, and on examination he had limited range of motion in that shoulder. (Id. at 1880, 1882.) He had full range of motion in his cervical spine and lumbosacral spine and his straight leg test was negative. (Id. at 1882.) In August 2015 Dr. Marra advised that Ted did not require "further care" or "medications other than oral antiinflammatories." (Id. at 712.) On examination in October 2015 Ted had strength in the upper extremity of 5/5 and full range of motion of the cervical spine, elbow, wrist, and hand. (Id. at 1837.) During a March 2016 visit, Ted had full range of motion in his cervical spine with limited range of motion in his left shoulder. (Id. at 1911.) His lower extremity strength was 5/5, he was neurologically intact, and his sensation was normal. (Id.)

4

As to Ted's back pain, he complained of discomfort at a level of 8/10 in August 2015, which radiated to the lower extremity toward the right side. (Id. at 1679.) He reported that he was not experiencing numbness or tingling, although he was having difficulty walking and standing. (Id.) On examination Ted was found to have "[l]imited range of motion of the lumbosacral spine with pain on flexion" and a positive straight leg raise in the right lower extremity. (Id. at 1681.) His lower extremity strength was 5/5 and his sensory was intact. (Id.) During a September 2015 visit, Ted reported his back pain at a level of 4/10, with a 90 percent improvement in back pain following a lumbar epidural steroid injection, but the pain returned when he climbed stairs and when he walked. (Id. at 1817.) Ted rated his overall improvement at about 60 percent and said he had stopped using a cane. (Id.) A lumbar MRI conducted in October 2015 revealed mild diffuse degenerative disc disease but no compression deformity or evidence of fracture. (Id. at 1839-40.)

With respect to coronary artery disease, Ted reported a prior quadruple bypass surgery, but treatment records listed his status as "stable from previous" exam. (Id. at 24, 1534-35.) Before his April 2013 left-extremity surgery, Ted underwent a cardiovascular examination, and it did not reveal any signs of ischemia. (Id. at 500.) His blood pressure was well-controlled, though lower extremity edema was noted that "[m]ost likely" was related to obesity and dependency.[2] (Id.)

---

[2] The record is unclear as to the kind of "dependency" Ted experienced.

5

As to Ted's diabetes, at a February 2013 follow-up appointment he was noted to be taking medications regularly but not following his recommended diet. (Id. at 24, 1539.) Ted denied tingling and numbness in his extremities. (Id. at 1539.) His diabetic foot examination was normal. (Id. at 1541.) In July 2015 he reported that his diabetes was poorly controlled on insulin treatment. (Id. at 878.)

**B.     Ted's Hearing Testimony**

Ted testified at the hearing that he stopped working on January 1, 2012, because of an injury he suffered in November 2011. (A.R. 44.) After questioning by the ALJ regarding his earnings records, Ted clarified that he stopped working in January 2013 as a result of an on-the-job injury that occurred in November 2012. (Id. at 45; see also id. at 20.) He explained that he was standing on a ladder when he dropped a 200-pound hose filled with oil, injuring his left arm and shoulder. (Id. at 44.) Ted testified that following the injury he had surgery on his left arm. (Id. at 46.) He said his left arm is numb from his shoulder down to his forefinger and thumb. (Id.) He has undergone therapy but said his "arm is still pretty much useless." (Id.)

Ted testified that he was off work for five years before being released to return to other work based on an evaluation performed in connection with a worker's compensation claim. (Id. at 47-48.) But he said that the combination of his impairments, including diabetes, obesity, and back and neck pain continue to prevent him from working. (Id. at 48.) In terms of his diabetes, Ted said he checks his blood sugar levels three times daily and was referred to an ophthalmologist. (Id.

6

at 50.) He did not have his eyes checked earlier because his health insurance had lapsed. (Id. at 50-51.) As for his back issues, Ted said that his physician recommended physical therapy, but Ted did not pursue it, again because he did not have health insurance. (Id. at 53, 54.) He stretches at home and has received injections for the pain. (Id.) Ted said he was referred to a specialist who performs surgery for back and hip issues, but that physician required physical therapy first, and insurance did not cover it. (Id. at 54.) He manages pain with injections and medication. (Id.)

Ted said that he also suffers from carpal tunnel syndrome, restless leg syndrome, sleep issues, and depression. (Id. at 55-57.) As to carpal tunnel syndrome, he underwent surgery on his right side and has not had any issues since then. (Id. at 54-55.) Surgery was recommended on the left side as well, but he has not pursued it because the impairment does not bother him as much when he does not work. (Id. at 55.) He treats the left side with cream, a glove, and a brace. (Id.) In terms of his restless leg syndrome, Ted said that his narcotic medication "take[s] care of it." (Id.) But because of his hip pain, he continues to have difficulty sleeping, despite the use of a CPAP machine. (Id. at 56.) Ted does not receive any treatment for depression because of insurance issues. (Id. at 57.)

Ted also testified that he shops for groceries "[e]very once in a while" but leans on the cart when doing so. (Id. at 59.) He said he has used a cane in the past to stand up and sit down. (Id. at 60.) He wears house slippers rather than shoes because of foot swelling. (Id. at 62.)

7

**C.     VE's Testimony**

A VE also testified at the hearing. She described Ted's prior work as tank-truck driver and material handler, which are designated as medium and heavy work, respectively, under the Dictionary of Occupational Titles ("DOT"). (A.R. 72.) The ALJ posed a series of hypotheticals to the VE regarding whether someone with a specific hypothetical residual functional capacity ("RFC") could perform Ted's past work. (Id.) In response to a hypothetical question positing an individual with an RFC for light work with limitations, including frequent reaching, occasional kneeling and crawling, never climbing ladders, ropes, or scaffolds, and avoiding unprotected heights and dangerous, moving machinery, the VE testified that such a person could not perform Ted's past work but could perform other occupations, such as marker, counter clerk, and sales attendant. (Id. at 72-73.)

In response to a separate, second hypothetical, reflecting an individual with an RFC for sedentary work with limitations, including frequent balancing, stooping, kneeling, crouching, and crawling, occasional climbing of ramps and stairs but never ladders, ropes, or scaffolds, occasional overhead reaching, and avoiding concentrated exposure to extreme temperatures and humidity, the VE testified that such a person could perform jobs such as break-linings coater (2,047 jobs available), order clerk (food and beverage) (3,694 jobs), and microfilming document preparer (46,541 jobs). (Id. at 73.)

When the ALJ added the restrictions of not working with vibratory tools or frequently handling and fingering bilaterally to the second hypothetical limitations,

8

the VE testified that the vibratory tools limitation eliminates all available jobs, but not the frequent handling and fingering limitation. (Id.) The ALJ then added another limitation to occasional pushing and/or pulling with the left non-dominant upper extremity, and the VE confirmed that the jobs would remain. (Id.) However, when the ALJ altered that limitation to no pushing or pulling with the left non-dominant upper extremity, the VE testified that the break-linings coater job would be eliminated but the order clerk and microfilming document preparer jobs would remain. (Id. at 74-75.) A charge account clerk job, with 66,065 available positions, also would be available, the VE said. (Id. at 75.) The VE testified that the hypothetical individual could not be off task for more than 15 percent in a workday or miss more than six to eight workdays per year. (Id.)

**D.     The ALJ's Decision**

The ALJ followed the required five-step process in evaluating Ted's disability claims. *See* 20 C.F.R. § 404.1520(a). At step one the ALJ found that Ted engaged in substantial gainful activity from January 1, 2012, his alleged onset date, through the date of injury, November 12, 2012. (A.R. 20.) At step two the ALJ concluded that Ted has the severe impairments of degenerative joint disease, SLAP lesion and tendinosis of the left shoulder resulting in arthroscopy and repair, musculocutaneous neuropathy in left upper extremity, left carpal tunnel syndrome, lumbar spondylosis, coronary artery disease, degenerative joint disease in the bilateral hips, diabetes, and obesity. (Id.) At step three the ALJ determined that Ted's impairments do not meet or medically equal any listed impairment. (Id. at

9

22.) Before turning to step four, the ALJ assessed Ted as having an RFC to perform sedentary work with limitations that he: can frequently balance, stoop, kneel, crouch, and crawl; occasionally climb ramps and stairs but never climb ladders, ropes, and scaffolds; occasionally reach overhead; and frequently handle and finger bilaterally. The ALJ further determined that Ted should avoid concentrated exposure to temperature extremes and humidity and cannot work with vibratory tools. (Id. at 23.) At step four the ALJ found that Ted cannot perform his past relevant work, but at step five the ALJ determined that significant jobs exist in the national economy that Ted can perform. (Id. at 29-30.)

## Analysis

Ted argues that the ALJ's decision should be reversed because the ALJ improperly rejected the state agency physician's opinion that Ted was limited in his ability to grasp and perform fine manipulation, and because, according to him, she failed to support her step-five finding with substantial evidence. (R. 21, Pl.'s Br. at 13.) Although Ted identifies only these two issues for this court's review, (id.), in the background section of his opening brief Ted also claims that the Appeals Council erred by failing to acknowledge the impact of a medical-vocational rule on his SSI application once he turned 50 years old, (id. at 2). The court reviews the ALJ's decision only to ensure that it is based on the correct legal criteria and supported by substantial evidence. *Prater v. Saul*, 947 F.3d 479, 481 (7th Cir. 2020). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148,

1154 (2019) (quotation marks and citation omitted). The ALJ is required to "build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014). But this court is "not free to replace the ALJ's estimate of the medical evidence" with its own, *see Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), and must uphold the decision even where "reasonable minds can differ over whether [the claimant] is disabled," *see Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

### A. Opinion Evidence

Ted argues that the ALJ erred by rejecting grasping and fine manipulation limitations assessed by Dr. James Greco, a state agency consultant. (R. 21, Pl.'s Br. at 13-15.) When weighing a medical opinion, an ALJ "must consider the entire record, including all relevant medical and nonmedical evidence," and adequately explain how she weighed an opinion in light of the record. *Murphy v. Astrue*, 454 Fed. Appx. 514, 518 (7th Cir. 2012) (internal quotations and citations omitted). At the reconsideration level, Dr. Greco found that Ted has an RFC for sedentary work with bilateral limitations on gross and fine manipulation (also referred to as handling and fingering) and no pushing or pulling with his left upper extremity. (A.R. 120-32.) The ALJ assigned great weight to Dr. Greco's opinion, adopting "the degree of resulting limitation/restriction" he indicated, except for the push/pull restriction. (Id. at 28.) She explained that despite Ted's complaints of sensory issues, he "has functional use of the left upper extremity," as determined by treating

11

orthopedist Dr. Marra in a November 2014 Functional Capacity Evaluation ("FCE"). (Id.) As a result, the ALJ found no limitation in Ted's ability to push or pull. (Id.)

Ted asserts that the ALJ failed to provide good reasons for rejecting part of Dr. Greco's opinion. (R. 21, Pl.'s Br. at 13-15.) He argues that in crafting an RFC allowing for frequent handling and fingering with either hand, the ALJ did not provide substantial evidence to support her rejection of Dr. Greco's limitations on grasping and fine manipulation. (Id.) In support of his argument, Ted points to reports by his wife and physicians that he has weakness, limited range of motion, sensitivity, numbness, weakness, and pain in his left arm. (Id. at 13-14 (citing A.R. 226, 706-09, 725, 878-79, 1454, 1457).) He also cites to testing showing bilateral carpal tunnel syndrome, (id. (citing A.R. 703)), along with his own testimony that his left arm is generally "useless," (id. (citing A.R. 46)). He contends that Dr. Greco's limitations were well-founded based on record evidence. (Id. at 14.)

The government responds that Ted's argument is based on a "mistake of fact" because Dr. Greco never found that Ted was unable to handle or finger. (R. 31, Govt.'s Mem. at 2.) Dr. Greco instead opined that Ted's handling and fingering were limited, such that he "would not be able to perform constant handling and fingering with either hand," but he could do so "frequently, bilaterally." (Id. (citing A.R. 129) (including narrative explaining that Ted's "H/F [handling and fingering] is limited to frequently, bilaterally").) The ALJ adopted such limitation, including in her RFC assessment a limitation that Ted could only "frequently handle and finger

12

bilaterally." (A.R. 23.) The court therefore agrees with the government and finds that Ted's argument lacks foundation.

In his opening brief, Ted focuses his "Issue[] for Review" and subheading on this subject solely on the ALJ's purported error in rejecting Dr. Greco's grasping and fine manipulation limitations. (R. 21, Pl.'s Br. at 13.) Ted mentions the ALJ's rejection of Dr. Greco's push/pull limitation but fails to explain why the ALJ erred in this aspect of her decision, except to suggest that Dr. Greco's reference to Ted's "flaccid left biceps without muscle tone" supports Dr. Greco's RFC. (Id. at 14 (citing A.R. 128).) Because Ted offers at most a perfunctory argument regarding the ALJ's rejection of Dr. Greco's opinion regarding the push/pull limitation, the court deems such argument waived. *See Vang v. Saul*, 805 Fed. Appx. 398, 403 (7th Cir. 2020) ("Perfunctory and undeveloped arguments are waived." (internal quotations and citation omitted)).

Regardless, the ALJ provided substantial evidence to support her decision not to include a push/pull limitation in her RFC. The ALJ explained that she found Dr. Greco's opinion regarding the push/pull limitation unwarranted based on Dr. Marra's November 2014 FCE, which stated that Ted had functional use of his left upper extremity. (A.R. 28 (citing id. at 713 (allowing Ted to push 77 pounds and pull 120 pounds)).) Earlier in her decision the ALJ also noted results from an October 2015 consultative examination revealing "strength in the upper extremity at 5 out of 5." (Id. at 26 (citing id. at 1837).) Although examinations in early 2016 showed limited range of motion in the left shoulder, the ALJ pointed out that Ted

13

had full range of motion of the cervical and lumbosacral spines, negative straight leg testing, and normal sensation, and he was neurologically intact. (id. (citing id. at 1882, 1911, 1917)).) In his reply Ted cites evidence that, he says, undermines the ALJ's assessment and shows that she improperly played doctor. (R. 34, Pl.'s Reply at 2-3.) But this court cannot reweigh evidence in the record. *Zoch v. Saul*, ___ Fed. Appx. ___, 2020 WL 6883424, at *3 (7th Cir. Nov. 24, 2020). And while it is true that an ALJ may not "play[] doctor," here the ALJ "reasonably reviewed the evidence" and found that Dr. Greco's assessment of a push/pull limitation conflicted with the treating orthopedist's FCE finding that Ted had functional use of his left arm. (A.R. 28); *see Harris v. Saul*, ___ Fed. Appx. ___, 2020 WL 7078706, at *4 (7th Cir. Dec. 3, 2020). Accordingly, the court finds no error in the ALJ's refusal to adopt Dr. Greco's opinion regarding the push/pull limitation.

Moreover, even if the ALJ had included this limitation in her RFC, the government is correct that a significant number of jobs would have remained. (R. 31, Govt.'s Mem. at 3-4.) During the hearing, the ALJ asked the VE whether a hypothetical individual with Ted's RFC could perform identified jobs if a push/pull limitation were included. (A.R. 74-75.) The VE responded that a limitation precluding pushing and pulling would eliminate one of the identified jobs, but that the microfilm document preparer, order clerk, and charge account clerk positions would remain. (Id.) The court thus agrees with the government that even if the ALJ had erred in failing to adopt Dr. Greco's push/pull limitation, such error would be harmless. (R. 31, Govt.'s Mem. at 4.)

**B.     Step-Five Determination**

Ted argues that the VE's testimony does not support the ALJ's step-five determination that there is sufficient work available to him given the assigned RFC. (R. 21, Pl.'s Br. at 15.) Before relying on a VE's testimony at step five, an ALJ must ensure that substantial evidence supports the VE's testimony that "suitable jobs exist in significant numbers." *Chavez v. Berryhill*, 895 F.3d 962, 963 (7th Cir. 2018). Here the VE testified that a hypothetical worker of Ted's age and RFC could not perform past relevant work but that there are other jobs he could perform, including break-linings coater (2,047 jobs), food and beverage order clerk (3,694 jobs), and microfilm document preparer (46,541 jobs). (A.R. 73.) When the VE considered that the individual could not push or pull with the left, non-dominant upper extremity, she found that the break-linings coater job would be eliminated but that a charge account clerk job (66,065 jobs) could replace the break-linings coater. (Id. at 74-75.) In her decision the ALJ stated that she considered the VE's testimony during the hearing and "accept[ed] the conclusions rendered therein" in determining that Ted "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (Id. at 31.)

Ted argues that the ALJ failed to point to substantial evidence supporting her determination that a significant number of jobs are available to him. (R. 21, Pl.'s Br. at 15.) The court disagrees. In her testimony, the VE identified 52,282 available jobs. (A.R. 73.) When the VE considered the additional limitation that the individual could not push or pull with the left, non-dominant upper extremity,

15

she found another job available, bringing the available job tally even higher. (Id. at 74-75.) The VE answered "cogently and thoroughly" the questions posed by the ALJ and Ted's attorney. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1155 (2019). She also confirmed that her testimony was consistent with both the DOT and the companion publication Selected Characteristics of Occupations. (A.R. 75.) During the hearing Ted's attorney asked no questions relating to, and made no objection to, the sufficiency of the number of jobs identified by the VE. As such, the ALJ was entitled to rely on the VE's testimony in finding that jobs existed in significant numbers in the national economy that Ted could perform. *See Biestek,* 139 S. Ct. at 1155.

## C.     Grid Rule 201.14

In the "Background" section of his opening brief, Ted asserts that a remand is required because at the time the Appeals Counsel issued its order denying his request to review the ALJ's decision, he had reached the age of 50. (R. 21, Pl.'s Br. at 2.) Based on the RFC assessed by the ALJ, Ted contends that when he turned 50 he was rendered disabled for purposes of his SSI application pursuant to Medical-Vocational Guidelines ("the Grid") Rule 201.14.[3] (Id.; see also R. 34, Pl.'s Reply at 1.) Ted did not develop this argument—or include it in his itemized "Issues for Review." (R. 21, Pl.'s Br. at 2, 13.) Nor did the government respond to Ted's Grid Rule 201.14 assertion. (R. 31, Govt.'s Mem.) In his reply Ted offers some support

---

[3] The Grid is "a chart that classifies a person as disabled or not disabled based on [his] age, education, work experience, and exertional ability." *Devilbliss v. Saul*, No. 19 CV 932, 2020 WL 5645691, at *2 (E.D. Wisc. Sept. 22, 2020).

16

for his assertion for the first time. (R. 34, Pl.'s Reply at 1-2.) Based on his birth date of December 25, 1968, his high school education plus one year of college, his lack of transferable skills, and the ALJ's determination that he has an RFC for a range of sedentary work with no ability to perform past relevant work, Ted asserts that he satisfies the requirements for a finding of disability pursuant to Grid Rule 201.14. (Id.) But an argument first developed in a reply brief is deemed forfeited. *See Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011) (finding that "arguments made for the first time in reply briefs" may be treated as waived, particularly where the opposing party was "prejudiced by being denied sufficient notice to respond to an argument").

In any event, this is not a case in which Ted argues that the ALJ misapplied Grid Rules. The ALJ issued her decision in April 2018, and Ted did not turn 50 until December of that same year. As a result, this issue was not addressed at the administrative level. (R. 21, Pl.'s Br. at 2.) Ted claims, without citing any authority, that the Appeals Council erred by not acknowledging the impact of Grid Rule 201.14 on his SSI application. (Id.) He assumes that his skills would not be transferable, but neither the ALJ nor the VE addressed that issue. In her decision the ALJ found that transferability of job skills was "not material" because under the Grid Rules Ted was "not disabled" regardless of whether his job skills were transferable. (A.R. 30.) Also, in his opening brief Ted misstates the VE's testimony as finding both of his prior jobs "unskilled with an SVP of 2." (R. 21, Pl.'s Br. at 2.) The VE in fact found Ted's prior job as tank-truck driver "semiskilled" with an SVP

17

of 3. (A.R. 72; see also id. at 29.) Without a developed argument—at the administrative level or even in Ted's opening brief—showing how proper application of the Grid would result in an award of benefits, this court has no confidence that a "mechanistic application of the [Grid] Rules" would result in benefits being awarded to Ted. *Wirth v. Barnhart*, 318 F. Supp. 2d 726, 737 (E.D. Wisc. 2004). Accordingly, the court declines to decide this issue.

## Conclusion

For the foregoing reasons, Ted's motion is denied, and the government's is granted.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**